# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| STEVEN W. HABERMAN | § | |
| | § | |
| V. | § | CASE NO. 4:11cv126 |
| | § | (Judge Mazzant) |
| PNC MORTGAGE COMPANY FKA | § | |
| NATIONAL CITY MORTGAGE CO. | § | |
| A DIVISION OF PNC BANK FKA | § | |
| NATIONAL CITY BANK | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

On the 13th and 14th day of August, 2012, the parties appeared before the Court for a bench trial of this case, at which time the Court heard evidence and argument of counsel. The Court now enters its Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52. Any finding of fact which constitutes a conclusion of law shall be deemed a conclusion of law, and any conclusion of law which constitutes a finding of fact shall be deemed a finding of fact.

Plaintiff Steven W. Haberman ("Haberman" or "Plaintiff") brought the pending action against Defendant for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, alleging that Defendant obtained information from Plaintiff's credit report on eight (8) occasions without a permissible purpose pursuant to the statute.

Based upon the evidence at trial, the Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a):

### FINDINGS OF FACT[1]

1.  Plaintiff Steven W. Haberman is a "consumer" as defined by Texas Finance Code § 392.001(1) and the federal Fair Credit Reporting Act, 15 U.S.C. 1681, *et seq.*

---

[1] The parties stipulated to findings of fact nos 1-38.

2.  Defendant PNC Mortgage is a division of PNC Bank, National Association. PNC Bank, National Association is a successor by merger to National City Bank, National Association ("NCB") and its division, National City Mortgage ("NCM"). The merger occurred in November 2009. Unless otherwise indicated, PNC Mortgage and National City Mortgage are referred to herein collectively as "PNC Mortgage" or "Defendant."

3.  PNC Mortgage is a user and/ or furnisher to credit bureaus like TransUnion, LLC ("TransUnion"). PNC is not a credit reporting agency.

4.  On December 22, 2006, NCM loaned funds to Haberman for the construction of a residential home. Haberman executed a promissory note in favor of NCM in the amount of $558,000 and executed a Deed of Trust granting a lien against the real property to NCM in the event of default.

5.  Construction of the residential home was not completed.

6.  Haberman was unable to meet his mortgage obligation and stopped making the loan payments in July 2008.

7.  Haberman filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division, Case No. 08-42220 on August 21, 2008.

8.  Haberman listed NCM's debt claim on Schedule "D" of his bankruptcy petition as a secured claim.

9.  The Discharge Order discharged Haberman from any liability for PNC's claim. The Discharge Order prohibited any attempt by Defendant to collect from Haberman the debt that had been discharged.

10. The Discharge Order was mailed out to all creditors and other parties listed on the mailing matrix previously filed with the Bankruptcy Court, including Defendant. Notice to Defendant was

not returned. Defendant received the notice of discharge.

11.     At no time during the Chapter 7 case did Defendant object or dispute the details of the claim in the August 21, 2008 schedules. At no time during the Chapter 7 case did Haberman reaffirm the underlying debt with Defendant. At no time during the Chapter 7 case was Defendant's pre-petition claim declared to be non-dischargeable.

12.     Haberman has not requested or otherwise created any credit relationship with Defendant at any point subsequent to his December 19, 2008 discharge.

13.     PNC foreclosed and purchased the property at a foreclosure sale on August 4, 2009.

14.     The property was not vacated and PNC sought to obtain possession of the property through a forcible detainer action on August 27, 2009.

15.     Haberman was a named defendant in the forcible detainer action.

16.     PNC obtained judgment for possession of the property on October 30, 2009. The occupier of the property appealed PNC's judgment for possession. PNC is entitled to possession of the property.

17.     The October 30, 2009 judgment of possession does not appear on any TransUnion, LLC credit report.

18.     Haberman only learned of the 2009 forcible detainer action in this lawsuit.

19.     In June 2010, Haberman obtained a copy of his consumer report from TransUnion, LLC.

20.     Haberman's June 23, 2010 TransUnion consumer report shows two accounts relating to Haberman's discharged mortgage: a construction loan reported by National City Mortgage, and a conventional real estate mortgage reported by PNC Mortgage. Both of these accounts are shown as being reported as "closed" with no balance owing, and a remark of "Chapter 7 Bankruptcy" as of

August 2008.

21. There have been no updates to the listings referencing the construction loan and conventional real estate mortgage on Haberman's TransUnion consumer report since August 2008.

22. Haberman's June 23, 2010 TransUnion consumer report shows the following listing three (3) times under the heading "Account Review Inquiries" and states "Requested On" April 2010, May 2010, and June 2010:

National City Mortgage
3980 Chicago Dr.
SW Suite 210
Grandville, Michigan 49418
(888) 533 – 5363

23. Under the heading "Account Review Inquiries," the June 23, 2010 report states that "the companies listed below obtained information from your consumer report for the purpose of an account review or other business transaction with you."

24. Haberman did not initiate any business transaction with Defendant in April 2010, May 2010, or June 2010.

25. PNC is not listed anywhere else in any inquiry section of Mr. Haberman's June 23, 2010 consumer report.

26. The instant lawsuit was filed on February 8, 2011.

27. In May 2011, Haberman obtained another copy of his consumer report from TransUnion.

28. Haberman's May 10, 2011 TransUnion consumer report shows the following listing four (4) additional times under the heading "Account Review Inquiries" and states "Requested On" August 2010, September 2010, October 2011, and January 2011:

National City Mortgage
3980 Chicago Dr
SW Suite 210
Grandville, Michigan 49418
(888) 533 – 5363

29. Under the "Account Review Inquiries" heading, the report states that "the companies listed below obtained information from your consumer report for the purpose of an account review or other business transaction with you."

30. Haberman did not initiate any business transaction with Defendant in August 2010, September 2010, October 2010, or January 2011. PNC is not listed anywhere else in any inquiry section of Mr. Haberman's June 23, 2010 consumer report.

31. In October 2011, and pursuant to a subpoena issued pursuant to Rule 45 of the Federal Rules of Civil Procedure, TransUnion produced in this litigation Haberman's consumer credit report dated June 23, 2010, May 10, 2011, and September 6, 2011.

32. Haberman's September 6, 2011 TransUnion consumer credit report shows the following additional listing under the heading "Account Review Inquiries and states "Requested On" July 2011:

National City Mortgage
3980 Chicago Dr.
SW Suite 210
Grandville, Michigan 49418
(888) 533 – 5363

33. Under the "Account Review Inquiries" section, the September 2011 report states that "the companies listed below obtained information from your consumer report for the purpose of an account review or other business transaction with you."

34. Haberman did not initiate any business transaction with the Defendant in July 2011.

5

35. PNC is not listed anywhere else in any inquiry sections of Haberman's June 23, 2010 consumer report.

36. Haberman never received a telephone call or written letter from PNC attempting to collect on the mortgage loan debt.

37. There is nothing incorrect or falsely reported on the June 23, 2010, May 20, 2011, and September 6, 2011 consumer reports relating to the PNC/National City Mortgage information.

38. On or around June 6, 2011, PNC filed another forcible detainer action to obtain possession because the property remained occupied. Haberman was a named defendant in the forcible detainer action. PNC obtained judgment for possession of the property on July 28, 2011. Haberman only learned of this forcible detainer action through a public records search on himself in or around August 2011.

39. PNC is a furnisher of consumer credit information to TransUnion, one of the three (3) national consumer reporting agencies.

40. PNC has a contract with TransUnion that governs not only its duties with respect to reporting of consumer credit information, but also PNC's ability to access consumer reports from TransUnion.

41. In June 2010, Haberman obtained a copy of his consumer report from TransUnion. Under the heading Account Review Inquiries, this section shows that Defendant obtained information from Plaintiff's TransUnion consumer report in April 2010, May 2010, and June 2010. Haberman did not have an account with or otherwise initiate any business transaction with Defendant in April 2010, May 2010, or June 2010.

42. Defendant knew or had reason to know that there no longer existed any account for it to "review" with respect to Plaintiff, and so, it had no permissible purpose to access his credit report

information for "account review" purposes in April 2010, May 2010, and/or June 2010.

43. While Defendant is unable to produce any evidence as to why account reviews were done on Plaintiff in April 2010, May 2010, or June 2010, by what department, and for what purpose, TransUnion has confirmed that some information was obtained by Defendant in those months under the guise of an "account review."

44. Plaintiff, by and through counsel, contacted Defendant, by and through counsel, and advised of Defendant's improper access to Plaintiff's credit report, and attempted to resolve the matter without litigation.

45. Despite communication by Plaintiff, by and through counsel, Defendant obtained copies of Plaintiff's TransUnion consumer report on at least four (4) additional occasions.

46. While Defendant is again unable to produce any evidence as to why any account reviews were done on Plaintiff, by what department, and for what purpose, Plaintiff's TransUnion consumer report dated May 10, 2011, shows that Defendant obtained information about Plaintiff from TransUnion in August 2010, September 2010, October 2010, and January 2011.

47. Again, the stated purpose for Defendant's obtaining Plaintiff's consumer report was for "account review" or "other business transaction."

48. It is undisputed that Haberman did not have an account with or otherwise initiate any business transaction with Defendant in August 2010, September 2010, October 2010, or January 2011.

49. Defendant knew that it had no permissible purpose to access Haberman's credit report information for "account review" purposes in August 2010, September 2010, October 2010, and January 2011.

50.     Despite the filing of the instant lawsuit which specifically claims Defendant has no legal purpose to access Haberman's credit report, Defendant obtained copies of Plaintiff's TransUnion consumer report on at least one (1) additional occasion.

51.     While Defendant is unable to produce any evidence as to why the account review was done, by what department and for what purpose, TransUnion has confirmed that some information was obtained by Defendant in those months under "account reviews."

52.     Plaintiff's TransUnion consumer report dated September 6, 2011, shows that Defendant obtained information about Plaintiff from TransUnion in July 2011. Again, the stated purpose for Defendant's obtaining Plaintiff's consumer report was for "account review" or "other business transaction." It is undisputed that Haberman did not have an account with or otherwise initiate any business transaction with Defendant in July 2011.

53.     The credit reports all contained the same address. The address and telephone number are associated with PNC/National City Mortgage's Consumer Direct Lending Center. The telephone number remains active today; however, there are no active business operations at that location.

54.     The credit reports also advise that the inquiries in that section are not displayed to anyone other than Haberman and will not affect any creditor's decision or any credit score.

55.     Haberman never filed a claim or contacted TransUnion to object to the inquiries. Haberman never disputed the inquiries allegedly conducted by PNC/National City with TransUnion.

56.     According to TransUnion, the alleged inquiries are soft inquiries that cannot be seen by anyone other than the consumer and the user of the information.

57.     The credit reports themselves inform the reader that the inquires cannot be seen by anyone other than the individual himself. Typically, such inquiries are made via batch process.

58. Defendant asserts that the inquiries are the result of PNC/National City's Trigger program.

59. The only National City Mortgage or PNC program involving TransUnion relevant to that address was the Trigger program.

60. The Trigger program returned to PNC/National City the identity of current mortgage customers who had a recent mortgage credit inquiry from a financial institution. That is, the customer had most likely sought financing at another institution which had pulled a credit report.

61. The Trigger program generated a listing of names, phone numbers, and addresses; it did not pull information concerning trade lines or credit scores. The Trigger program had nothing to do with any collection efforts.

62. By 2010, when Haberman first noticed the inquiries by National City Mortgage, National City Bank had already been merged into PNC and no longer existed. National City Bank merged into PNC Bank, National Association effective November 6, 2009.

63. Prior to December 18, 2009, the consumer direct division operated at the office on Chicago Drive. The consumer direct division at that location was a call center that interacted with customers of National City Mortgage.

64. The only contract produced by TransUnion purporting to govern the exchange of information between PNC and TransUnion in 2010 and 2011 does not identify any National City affiliate or any National City entity located in Grandville, Michigan.

65. Plaintiff's TransUnion credit report provides two pieces of information regarding each subscriber who purportedly requested the account reviews: an address and a name.

66. Individual requests by loan officers are hard inquiries that would not be reported as account review inquiries on a consumer report like Haberman's.

67.     PNC Mortgage, a division of PNC Bank, National Association, asserts it conducted a diligent review of any and all records related to either that address or that entity, which might contain information related to any account review. However, the only evidence offered at trial was that Haberman's name was not in the Trigger database. Defendant did not maintain a list of the names submitted at the beginning of the Trigger program, and there is no way to determine whether Haberman's name was accidently submitted at the beginning of the process. The representative of the Trigger program is at a loss to explain how Defendant's name appeared on Haberman's credit reports. There is no evidence that Defendant searched any other database other than the Trigger program database to determine whether Haberman's name appeared.[2]

68.     PNC Mortgage asserts that it has no record of requesting or receiving any information related to Haberman from TransUnion for any of the months identified on Haberman's TransUnion credit reports.

69.     Pursuant to the testimony of Plaintiff's expert, Evan Hendricks, lending institutions such as Defendant commonly purchase account monitoring or "trigger" products to track their existing customers (whether credit card customers, mortgage customers, bank customers, etc.) to evaluate whether the customers continue to meet the terms of their respective obligations and/or to market additional products to such customers. Defendant's Consumer Direct department's Trigger program tracks existing mortgage customers who may be seeking mortgage financing elsewhere so that department can follow up with such existing customers in an effort to retain their business.

70.     Defendant's Consumer Direct department's Trigger program is one type of account

---

[2] In closing argument, Defendant did attempt to refer to additional evidence that counsel represented would show searches in other departments, but this evidence was not offered during the trial and is not before the Court.

monitoring or "trigger" product available to lending institutions such as Defendant. The Consumer Direct department has only one relationship with TransUnion—the Trigger Program. The Trigger program generated a listing of names, phone numbers, and addresses (to confirm a customer's identity); it did not pull information concerning trade lines or credit scores.

71. Defendant claims to have searched its Trigger program records and could not find any information about Plaintiff. Defendant admits that it only searched for information about whether it obtained a consumer report(s) about Plaintiff within its Consumer Direct department's Trigger program.

72. Defendant does not dispute that it utilizes other account monitoring or "trigger" products.

73. Based on the overwhelming weight of the evidence, specifically including the testimony of Evan Hendricks and Lynn Romanowski, as well as the three TransUnion credit reports that were admitted at trial showing TransUnion's record of the instances on which TransUnion forwarded some or all information from Plaintiff's credit report to Defendant, the Court finds that Defendant obtained a consumer report about Plaintiff on each of the instances indicated as "Account Review Inquiries" on those TransUnion credit reports.

74. Defendant does not dispute that Plaintiff, by and through counsel, contacted Defendant in or around June 2010 to alert Defendant that it was illegally obtaining account reviews about Plaintiff without a permissible purpose.

75. The Court finds that Defendant had actual knowledge as of June 2010 that any additional account reviews about Plaintiff were being done without a permissible purpose.

76. The Court finds that Defendant obtained Plaintiff's consumer report without a permissible purpose in August, September, October 2010, and January 2011.

77. The Court finds that the consumer reports obtained by Defendant in August, September, October 2010, and January 2011 were done negligently and with reckless disregard of Plaintiff's rights, in willful violation of the FCRA.

78. National City Mortgage inquiries do not appear on any other credit bureau's reports.

79. In Haberman's consumer disclosures, TransUnion lists the name and address for the inquiries based on the use of a subscriber code linked to a TransUnion table of names and addresses that would populate the information automatically into the disclosure. TransUnion did not know what subscriber code was used for the National City Mortgage inquiries in Haberman's disclosures. TransUnion did not know what information was returned to PNC, nor did TransUnion know what information PNC received. All that TranUnion would have "would be the inquiry that would be posted to the file." TransUnion testified that PNC did not pull a credit report.

80. PNC has no record of TransUnion identifying Haberman to PNC as a trigger lead.

81. Haberman has failed to establish that he suffered actual damages in the form of mental, emotional, and physical stress and distress as a result of Defendant's intrusions into his private information.

82. Haberman did suffer some fear and confusion as to why account reviews were being done by Defendant when he no longer had an account or owed any money to Defendant, but the Court finds that these fears did not rise to a level that resulted in damages to Haberman. Plaintiff and his wife feared that Defendant would attempt to come after them for the discharged debt, but this fear was not reasonable under the facts of this case.

83. Although Haberman subscribed to a credit monitoring service, the Court finds that the purchase of this service had more to deal with rebuilding his credit after filing bankruptcy.

**CONCLUSIONS OF LAW**

1.      The Court has jurisdiction over the parties and over the subject matter of this action.

2.      The parties have consented in writing to trial of this case before this Court pursuant to 28 U.S.C. § 636.

3.      Plaintiff contends that Defendant negligently and/or willfully violated the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* on eight (8) separate occasions by requesting and obtaining information from Plaintiff's TransUnion credit report without having a legal, permissible purpose as required by the FCRA. Plaintiff contends that Defendant's conduct also constitutes a violation of the Texas Finance Code.

4.      The FCRA is a federal consumer protection statute enacted by Congress to ensure that consumer reporting agencies adopt reasonable procedures to protect the accuracy and confidentiality of consumer credit information. 15 U.S.C. § 1681(b). Much of the FCRA regulates conduct of credit reporting agencies, however the FCRA also extends to the conduct of parties who request credit information.

5.      Plaintiff is a consumer as defined by FCRA.

6.      The plain language of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, prohibits anyone from obtaining a consumer report without a permissible purpose. 15 U.S.C. § 1681b(f). Section 1681b(a)(3) lists the all-inclusive purposes for which a consumer report can be obtained, and states in pertinent part:

(a) In General. – [A] consumer reporting agency may furnish a consumer report under the following circumstances and no other:
(3) To a person which it has reason to believe –
(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit

to, or review or collection of an account of, the consumer;
* * *
(F) otherwise has a legitimate business need for the information * * *
(ii) to review an account to determine whether the consumer continues to meet the terms of the account.

15 U.S.C. § 1681b(a)(3).

7. Under FCRA, the term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for—

(A) credit or insurance to be used primarily for personal, family, or household purposes;

(B) employment purposes; or

(C) any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d)(1). "A consumer report, therefore, is virtually any information communicated by a 'consumer reporting agency for any one of the purposes enumerated in 1681a and 1681b....' " *Hoke v. Retail Credit Corp.*, 521 F.2d 1079, 1081 (4th Cir. 1975). As the foregoing definition demonstrates, a consumer report is made up of three elements: (1) information communicated by a consumer reporting agency; (2) bearing on any one of a list of factors; and (3) that is used or expected to be used or collected in whole or in part for any one of several purposes. *Yang v. Government Employees Ins. Co.*, 146 F.3d 1320, 1323 (11th Cir. 1998).

8. Thus, "the definition of 'consumer report' has essentially been limited to information that is 'used or expected to be used or collected in connection with a 'business transaction' involving one of the 'consumer purposes' set out in the statute, that is, eligibility for personal credit or insurance,

14

employment purposes, and licensing." *Ippolito v. WNS, Inc.*, 864 F.2d 440, 451 (7th Cir. 1988). *Cavaliere v. Burke*, 50 F.3d 1033, at *4 (5th Cir. 1995).

9. In a case cited by Defendant, the Tenth Circuit stated that the "FCRA includes in its definition of a 'consumer report' any communication bearing on a consumer's 'character, general reputation, personal characteristics, or mode of living' which is used to establish eligibility for [credit or insurance to be used primarily for personal, family, or household purposes]." *Owner-Operator Independent Drivers Ass'n, Inc. v. USIS Commercial Services, Inc.*, 537 F.3d 1184, 1190 (10th Cir. 2008); 15 U.S.C. § 1681a(d)(1).

10. The FCRA's definition of consumer report bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, does not seem very demanding, for almost any information about consumers arguably bears on their personal characteristics or mode of living. *TransUnion Corp. v. F.T.C.*, 81 F.3d 228, 231 (C.A.D.C. 1996); *TransUnion Corp. v. F.T.C.*, 245 F.3d 809, 813 (C.A.D.C. 2001).

11. 15 U.S.C. § 1681b(f) provides as follows:

[a] person shall not use or obtain a consumer report for any purpose unless ... (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and (2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

15 U.S.C. § 1681b(f). Among the permitted purposes for which a report may be furnished under this provision is a "legitimate business need ... in connection with a business transaction that is initiated by the consumer." 15 U.S.C. § 1681b(a)(3)(F)(i).

12. In order to maintain a claim under § 1681b(f), a plaintiff must establish the following three elements: (1) that there was a 'consumer report' within the meaning of the statute; (2) that the

defendant used or obtained it; and (3) that the defendant did so without a permissible statutory purpose. *McFarland v. Bob Saks Toyota, Inc.*, 466 F. Supp. 2d 855, 867 (E.D. Mich. 2006). A plaintiff must also demonstrate that the defendant acted with the requisite degree of culpability—either negligence, 15 U.S.C. § 1681o(a), or willfulness, 15 U.S.C. § 1681n(a)—in order to impose civil liability under the FCRA. *Godby v. Wells Fargo Bank, N.A.*, 599 F. Supp. 2d 934, 938 (S.D. Ohio 2008).

13. At 15 U.S.C. § 1681b(a)(3), the FCRA provides a list of permissible purposes:

(a) In general. Subject to subsection (c) of this section, any consumer reporting agency may furnish a consumer report under the following circumstances and no other:
(3) To a person which it has reason to believe—
(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer;

(F) otherwise has a legitimate business need for the information—
(i) in connection with a business transaction that is initiated by the consumer; or
(ii) to review an account to determine whether the consumer continues to meet the terms of the account.

14. "There is a difference in opinion on whether ... [the] FCRA contains an absolute prohibition against the sale of credit reports to former creditors whose accounts are closed and paid in full." *Levine v. World Fin. Network Nat'l. Bank*, 437 F.3d 1118, 1122 (11th Cir. 2006) (citing *Wilting v. Progressive County Mut. Ins. Co.*, 227 F.3d 474, 476 (5th Cir. 2000)) ("[N]either [FCRA] nor the FTC's commentary on [FCRA] suggests that a report may only be permissibly obtained during particular points in the parties' relationship."); *Anglin v. Tower Loan of Mississippi, Inc.*, 635 F. Supp. 2d 523 (S.D. Miss. 2009).

15. The Court finds by preponderance of the evidence that Defendant accessed Haberman's information from TransUnion, which would qualify as a consumer report. Although Haberman

could not offer what exact information Defendant obtained – because the only entity that would have information is Defendant and no evidence has been produced from Defendant to determine exactly what was received – what is clear is that Defendant accessed parts of Haberman's credit reports on eight separate occasions. There is no evidence that TransUnion did this in error. Defendant obtained the information for some unknown purpose. The Court also finds that there was no permissible purpose for Defendant to access Haberman's credit reports on eight separate occasions. Therefore, the Court finds by a preponderance of the evidence that Defendant violated the FCRA.

16. The Court finds by preponderance of the evidence that Defendant's violations of FCRA were negligent. 15 U.S.C. § 1681o, in pertinent part, provides as follows:

(a) In general. Any person who is negligent in failing to comply with any requirement imposed under this title [ ] with respect to any consumer is liable to that consumer in an amount equal to the sum of–
(1) any actual damages sustained by the consumer as a result of the failure.

15 U.S.C. § 1681o(a)(1). The Court finds that Haberman has not been denied credit or otherwise suffered actual damages as a direct result of Defendant's account reviews. The Court cannot separate the stress or pain and suffering Haberman suffered from filing bankruptcy and the improper access to his credit report that had no effect on his credit standing. There is no evidence Defendant did anything with the improper account reviews, and Defendant did not make any collection efforts against Haberman. Although Haberman testified that he wanted to get on with his life, the Court finds that this had more to do with filing his bankruptcy case rather than the eight account reviews. The Court just did not find it credible that Plaintiff suffered pain and suffering or any other actual damage as a result of the account reviews.

17. Under section 1681n, as an alternative to actual damages, the Court may award statutory

damages of not less than $100.00 or more than $1,000.00 when there is a willful violation of FCRA. 15 U.S.C. § 1681n(a)(1)(A). The Court finds by a preponderance of the evidence that either these ongoing intrusions were intentional, or Defendant cared so little about the duties owed under the FCRA that such conduct was done with reckless disregard of Haberman's rights, giving rise to a willful violation of the statute. 15 U.S.C. § 1681n. Defendant's conduct entitles Haberman to an award of statutory damages for each of the eight impermissible pulls done by Defendant. Although the statute itself provides no criteria for courts to apply in assessing what amount of statutory damages might be appropriate, the Court has discretion to award statutory damages within the range provided by statute. *See Sullivan v. Greenwood Credit Union*, 520 F.3d 70, 74 (1st Cir. 2008). The Court finds that a damage award of $1,700 is appropriate in this matter and orders Defendant to pay $1,700 to Haberman in damages. The $1,700 represents $100 for the seven account reviews and $1,000 for the eighth account review, which occurred after Defendant was sued in this case.

18. The Court finds that Defendant's conduct does not entitle Haberman to an award of punitive damages pursuant 15 U.S.C. § 1681n(a)(2).

19. Haberman is entitled to an award of attorney's fees.

20. All costs are to be paid by Defendant.

**IT IS SO ORDERED.**
**SIGNED this 7th day of September, 2012.**

_____
AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE